IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

SHERRY GOLDAMMER, DONALD GERHARD,
RON VEILLON, CARMEN THOMAS, SHARON
CHUDY, LINDA POOL, BREN H. TAYLOR,
FAUNA RAE EHRMAN, and DIANA RHODES,
on behalf of themselves and all
others similarly situated,

        Plaintiffs,

v.

ANN VENEMAN, in her official capacity
as Secretary of the United States
Department of Agriculture; ART GARCIA,
in his official capacity as Administrator
of the Rural Housing Service; LYNN
SCHOESSLER, in his official capacity as
State Director of the Oregon Rural
Development Office; DBSI/TRI IV, an Idaho
limited partnership; DBSI REALTY CORPORATION,
an Idaho corporation; and NORTHWEST REAL
ESTATE CAPITAL CORPORATION, an Idaho
nonprofit corporation,

        Defendants.

03-CV-1749-BR

OPINION AND ORDER

1 - OPINION AND ORDER

**MICHELLE RYAN**
**ART SCHMIDT**
**ED JOHNSON**
**SPENCER M. NEAL**
Oregon Law Center
813 S.W. Alder Street, #500
Portland, OR  97205
(503) 295-2760

**CHRISTINA DIRKS**
Oregon Law Center
455 S. 4th Street, Suite 5
P.O. Box 1098
Coos Bay, OR  97420
(541) 269-1226

              Attorneys for Plaintiffs

**ANDREW R. GARDNER**
Stoel Rives LLP
900 S.W. Fifth Avenue, Suite 2600
Portland, OR  97204
(503) 224-3380

**C. CLAYTON GILL**
Moffatt Thomas Barrett Rock & Fields
101 South Capitol Blvd., Tenth Floor
P.O. Box 829
Boise, ID 83701
(208) 345-2000

                 Attorneys for Defendants DBSI/TRI IV, DBSI Realty
                 Corporation, and Northwest Real Estate Capital
                 Corporation

**KARIN J. IMMERGUT**
United States Attorney
**RONALD K. SILVER**
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204
(503) 727-1044

              Attorneys for Defendant Ann Veneman

**BROWN, Judge.**

This matter comes before the Court on Plaintiffs' Motion for Summary Judgment (#118).

For the reasons that follow, the Court **GRANTS** Plaintiffs' Motion.


<u>**BACKGROUND**</u>

Plaintiffs are low-income tenants of Forest Village Apartments in Reedsport, Oregon; Seacrest Apartments in Bandon, Oregon; and Meadowbrook I Apartments in John Day, Oregon. Plaintiffs bring this action on behalf of themselves and as a class action on behalf of others who are also residents of these three apartment complexes. Plaintiffs also seek relief on behalf of residents of other apartment complexes: specifically, Hillside Terrace in Coquille, Oregon; Norseman Village in Junction City, Oregon; and Vittoria Square in Newberg, Oregon. None of the named Plaintiffs, however, have resided in the latter three complexes.

Each of the six apartment complexes was developed and/or financed under Section 515 of the National Housing Act, 42 U.S.C. § 1485, and the loans were administered through the United States Department of Agriculture's (USDA) Rural Rental Housing Program. Under the program, the Rural Housing Service (RHS) is authorized to loan money on favorable terms, including low-interest rates,

tax advantages, and rent subsidies, to finance the construction and purchase of rural rental property.  Property owners who obtain loans from RHS agree to rent units at affordable rates to low-income tenants for the duration of the loan.  The RHS loan agreements at issue did not include any restrictions on the property owners' ability to prepay their loans and thereafter to remove the properties from the low-income housing program.

To retain housing in the low-income pool, Congress enacted the Emergency Low Income Housing Preservation Act (ELIHPA) in 1987, which places restrictions on prepayment of RHS loans.  *See* 42 U.S.C. § 1472(c).  Under ELIHPA, the government is not permitted to accept a prepayment offer from a property owner until the government has made a finding that the prepayment will not affect low-income housing opportunities and the residents of the property will not be displaced.  If the government finds residents will be displaced because of the prepayment, the government must identify affordable housing in the community to which the displaced persons can be relocated.  If the government finds prepayment of the loan will displace residents and affordable low-income housing is not available in the community, it must offer the owner incentives to remain in the program before accepting prepayment.  If the owner does not accept the incentives, the government must require the owner to offer the property for sale for a period of six months to qualified

nonprofit organizations or to public agencies.

In 1998 Defendants DBSI/TRI IV and DBSI Realty Corporation (DBSI), owners of the six apartment complexes, sought to prepay the loan balances pursuant to the loan agreements.  The government asserted the apartment complexes were subject to Section 515 and, therefore, subject to the prepayment provisions of ELIHPA.  The government, therefore, rejected the prepayments and directed DBSI to comply with ELIHPA's regulatory prepayment procedures.

On October 27, 1998, DBSI filed a quiet-title action in this Court against the government.  *See DBSI/TRI IV Ltd. P'ship v. United States*, Case No. CV-98-1325-BR.  DBSI asserted it was contractually entitled to prepay its loans, to free the properties from the government's liens, and to remove the properties from the restrictions of Section 515.  Plaintiffs in this action filed a Motion to Intervene in Case No. CV-98-1325-BR, but the Court denied their Motion.  DBSI ultimately reached an agreement with the government, and the Court entered a Judgment quieting title in DBSI as to the Forest Village and Seacrest properties and dismissed the action with prejudice.  DBSI prepaid its loan in December 2003 and sold the Forest Village and Seacrest properties to Defendant Northwest Real Estate Capital Corporation.

On December 19, 2003, Plaintiffs filed a Complaint in this

Court under the Administrative Procedures Act (APA), 5 U.S.C.
§ 701, *et seq.*, alleging Federal Defendants acted contrary to the
law when they allowed DBSI to prepay its loans on the Forest
Village and Seacrest properties and to exit the Section 515
program without complying with ELIHPA.  On November 23, 2004,
Plaintiffs filed a Second Amended Complaint.  In addition to
their allegation that Federal Defendants acted contrary to the
law when they allowed DBSI to prepay its loans on the Forest
Village and Seacrest properties and to withdraw these properties
from the Section 515 program, Plaintiffs alleged (1) DBSI
violated ELIHPA when it failed to file a prepayment request with
RHS, to offer to sell the developments to a qualified nonprofit
organization or public agency, and to inform Plaintiffs of its
intent to terminate the Section 515 financing; (2) Federal
Defendants violated Plaintiffs' rights to due process when they
terminated the Section 515 loan contract on the developments
without proper notice; (3) DBSI and its successors-in-interest
violated Plaintiffs' rental agreements when they raised
Plaintiffs' rent without notice; and (4) the conduct of DBSI and
its successors-in-interest violated Oregon's Landlord Tenant Act,
Or. Rev. Stat. § 90.240(5)(a).  Plaintiffs sought a declaration
that Defendants violated Section 515 and ELIHPA and that Federal
Defendants violated the APA and Plaintiffs' rights to due
process.  Plaintiffs also sought an injunction enjoining

Northwest from raising Plaintiffs' rents, ordering Defendants to reverse DBSI's prepayment of the Section 515 loans, and enjoining Federal Defendants from accepting full payment of any Section 515 loans unless the prepayment of the loan was processed in accordance with the requirements of ELIHPA.  In their Response to Federal Defendants' Motion for Summary Judgment, however, Plaintiffs withdrew their claims as to the Forest Village property and their request for an injunction forbidding rent increases at Seacrest.

On May 26, 2005, the Court granted Defendants' Motions for Summary Judgment as to Plaintiffs' first three claims on the ground that, pursuant to *Kimberly Associates v. United States*, 261 F.3d 864 (9th Cir. 2001), ELIHPA's prepayment restrictions cannot be used to prevent enforcement of the government's contracts with property owners.  Accordingly, the Court dismissed those claims with prejudice.  In addition, the Court declined to exercise supplemental jurisdiction over Plaintiffs' state-law claims and remanded those claims to state court.

On November 15, 2004, Plaintiffs appealed the Court's Opinion and Order denying their Motion to Intervene in Case No. CV-98-1325-BR.  On June 29, 2005, Plaintiffs appealed the Court's Opinion and Order granting Defendants' Motion for Summary Judgment in this matter.

On October 3, 2006, the Ninth Circuit issued an Opinion

affirming this Court's denial of Plaintiff's Motion to Intervene
in Case No. CV-98-1325-BR, reversing the Court's grant of
Defendants' Motion for Summary Judgment in this matter, and
remanding the matter for further proceedings.  The Ninth Circuit
specifically held Plaintiff Diana Rhodes lacked standing to bring
a claim under the APA, and, therefore, this Court's rulings as to
Rhodes's claims were not reversed or remanded.  The Ninth Circuit
also held the remaining Plaintiffs had standing to bring this
action because they suffered an injury-in-fact when their housing
status changed from Section 515 and, as a result, they lost
certain procedural safeguards and statutory protections available
under Section 515.  The Ninth Circuit directed this Court to
decide on remand whether Federal Defendants acted contrary to law
under the APA when they allowed DBSI to prepay its mortgage
obligation on Seacrest and to withdraw Seacrest from Section 515
as alleged in Plaintiffs' Second Amended Complaint.

On February 8, 2007, Plaintiffs filed a Motion for Summary
Judgment as to their claim that Federal Defendants violated the
APA when they acted in violation of ELIHPA and requested the
Court to set aside DBSI's prepayment of its Seacrest loan, to
rescind the conveyance of the property to Northwest, and to
return Seacrest to the Section 515 program.

## STANDARDS

Fed. R. Civ. P. 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law.  The moving party must show the absence of an issue of material fact.  *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005).  In response to a properly supported motion for summary judgment, the nonmoving party must go beyond the pleadings and show there is a genuine issue of material fact for trial. *Id*.

An issue of fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The court must draw all reasonable inferences in favor of the nonmoving party.  *Id*.  "Summary judgment cannot be granted where contrary inferences may be drawn from the evidence as to material issues."  *Easter v. Am. W. Fin.*, 381 F.3d 948 (9th Cir. 2004)(citing *Sherman Oaks Med. Arts Ctr., Ltd. v. Carpenters Local Union No. 1936,* 680 F.2d 594, 598 (9th Cir. 1982)).

A mere disagreement about a material issue of fact, however, does not preclude summary judgment. *Jackson v. Bank of Haw.*, 902 F.2d 1385, 1389 (9th Cir. 1990).  When the nonmoving party's claims are factually implausible, that party must "come forward with more persuasive evidence than otherwise would be

necessary." *Wong v. Regents of Univ. of Cal.*, 379 F.3d 1097 (9th Cir. 2004), *as amended by* 410 F.3d 1052, 1055 (9th Cir. 2005)(citing *Blue Ridge Ins. Co. v. Stanewich*, 142 F.3d 1145, 1149 (9th Cir. 1998)).

The substantive law governing a claim or a defense determines whether a fact is material. *Miller v. Glenn Miller Prod., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006).  If the resolution of a factual dispute would not affect the outcome of the claim, the court may grant summary judgment.  *Id*.

## DISCUSSION

Plaintiffs allege in their APA claim that Federal Defendants violated ELIHPA when they allowed DBSI to prepay its mortgage obligation on Seacrest and to withdraw Seacrest from Section 515.

**I.   The Court Has the Authority to Set Aside Federal Defendants' Actions as to Seacrest.**

Federal Defendants concede in their Response to Plaintiffs' Motion for Summary Judgment that they violated ELIHPA when they allowed DBSI to prepay its mortgage obligations on Seacrest and to withdraw Seacrest from the Section 515 program.

Section 702 of the APA provides:  "A person suffering legal wrong because of the agency action, or adversely affected or aggrieved by agency action within in the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C.

§ 702.  Section 706 requires a court reviewing an agency action
pursuant to § 702 to "hold unlawful and set aside agency action,
findings, and conclusions found to be -- (A) . . . not in
accordance with law."  5 U.S.C. § 706(2)(A).  The Court,
therefore, has the authority under § 706 of the APA to set aside
the loan prepayment and removal of Seacrest from the Section 515
program.

## II.  The Court May Balance the Equities.

Even though Federal Defendants violated ELIHPA, Defendants
contend the Court should deny the relief requested by Plaintiffs
notwithstanding the fact that § 706(2) provides "the reviewing
court shall . . . set aside agency action . . . not in accordance
with the law [or]   . . . without observance of procedure
required by law."  Defendants assert such relief would be too
burdensome, and, therefore, Defendants urge the Court to balance
the equities and to deny Plaintiffs' requests to set aside DBSI's
prepayment of its loan on Seacrest, to rescind the conveyance of
the property to Northwest, and to return Seacrest to the Section
515 program.  To support their contention that the Court may
balance the equities, Defendants rely on, among other cases, *NWF
v. Espy,* 45 F.3d 1337 (9th Cir. 1995).

In *Espy*, the plaintiffs brought an action against the
Secretary of Agriculture and others under the APA alleging the
Farmers Home Administration's (FmHA) transfer of property to the

11 - OPINION AND ORDER

individual defendants without creating easements to protect wetlands violated the Food, Agriculture, Conservation and Trade Act (FACTA), 7 U.S.C. § 1985(g), and the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(2)(C). *Id.* at 1340. The plaintiffs sought an order rescinding FmHA's conveyance, restoring title to the property to FmHA, and forbidding FmHA to dispose of the property without imposing wetland conservation easements. *Id*. at 1342. The Ninth Circuit concluded FmHA's transfer of the property without imposing wetland conservation easements on the property violated FACTA and noted the APA authorized the court in these circumstances "to void a property transaction and order a transfer of title where necessary." *Id.* The Ninth Circuit, however, also pointed out the district court "is not required to set aside *every* unlawful agency action" in spite of the fact that the plain language of the APA appears to require the district court to set aside unlawful agency action. *Id*. at 1343 (emphasis added). Instead "[t]he court's decision to grant or [to] deny injunctive or declaratory relief under [the] APA is controlled by principles of equity." *Id.* (citing *Westlands Water Dist. v. Firebaugh Canal*, 10 F.3d 667, 673 (9th Cir. 1993); *Sierra Pac. Indus. v. Lyng*, 866 F.2d 1099, 1111 (9th Cir. 1989)). *See also Tinoqui-Chalola Council of Kitanemuk and Yowlumne Tejon Indians v. Dep't of Energy*, 232 F.3d 1300, 1305 (9th Cir. 2000)("Although Occidental has raised several practical

considerations which counsel against rescission, none of these considerations affects the [Department of Energy's] ability to accept reassignment of [the property].  The significant, practical difficulties identified by Occidental are more appropriately considered when weighing the equities of any particular remedy.").

Thus, pursuant to *Espy*, the Court's decision whether to grant the relief sought by Plaintiffs is controlled by equitable principles.  *See also Northwest Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 680 (9th Cir. 2007)("Section 706(2) of the APA gives [the court] the equitable power to 'set aside' [any agency action] if [the court] determine[s] . . . [the agency's] action was . . . contrary to law.").  The Court, therefore, will balance the equities in this matter.

**III. Balancing the Equities.**

When balancing the equities, the Court "must act within the bounds of the statute." *Sierra Pacific Indus. v. Lyng*, 866 F.2d 1099, 1111 (9th Cir. 1989)("Our inquiry into the district court's authority to order equitable relief begins with the well-established principle that 'while the court must act within the bounds of the statute and without intruding upon the administrative province, it may adjust its relief to the exigencies of the case in accordance with the equitable principles governing judicial action.'")(quoting *Ford Motor Co.*

13 - OPINION AND ORDER

*v. NLRB*, 305 U.S. 364, 373 (1939)).  In addition, the Court may not refuse to issue an injunction when it is necessary to preserve precisely that which the statute seeks to preserve.  *TVA v. Hill*, 437 U.S. 153 (1978)(injunction required to enjoin violation of the Endangered Species Act).

Federal Defendants contend the equities weigh in Defendants' favor because rescission of the sale of Seacrest to Northwest and the return of Seacrest to Section 515 status could have the following consequences:  (1) if any current Seacrest tenants do not meet Section 515 eligibility requirements, RHS could either allow the current tenants to remain (thus precluding other eligible Section 515 individuals from living at Seacrest) or remove the ineligible tenants and subject the government to litigation from the evicted tenants and (2) RHS could have significant budgetary issues if it is ordered to reinstate the Seacrest loan.  In addition to the potential difficulties identified by Federal Defendants, the private Defendants also contend the equities weigh in Defendants' favor because Northwest would be unable to recoup its start-up costs of $25,000 or the $35,000 spent to obtain financing to rehabilitate the Seacrest

property.[1]

Plaintiffs do not allege any injury beyond that recognized by the Ninth Circuit in this matter:  *i.e.*, that they have lost certain procedural safeguards and statutory protections available under Section 515.  Plaintiffs assert, however, Federal Defendants are not entitled to equitable relief because (1) Defendants' arguments are unsupported and/or unpersuasive and (2) Defendants do not have clean hands.[2]

**A.   Seacrest Tenants Who Do Not Meet Section 515 Requirements.**

If the Court rescinds the sale of Seacrest and returns it to Section 515 status, Federal Defendants assert the government might have to remove from Seacrest those tenants who are not eligible for Section 515 housing and thus potentially subject the government to litigation from the evicted tenants. In the alternative, Federal Defendants assert they could allow the current Seacrest tenants who do not meet Section 515 eligibility requirements to remain at Seacrest, which, however, would mean other individuals who have Section 515 eligibility

---

[1] Although DBSI asserts other arguments relating to the quiet-title action and *Kimberly Associates v. United States*, 261 F.3d 864 (9th Cir. 2001), the Ninth Circuit rejected those arguments.  *See DBSI/TRI IV Ltd. P'ship v. United States*, 465 F.3d 1031 (9th Cir. 2006).  Thus, the Court need not address them.

[2] Because the Court concludes Defendants' arguments are unsupported and/or unpersuasive, the Court does not address Plaintiffs' alternative clean-hands argument.

could not live in those apartments.  Federal Defendants contend
either option is untenable.

As Plaintiffs note, however, RHS has promulgated
regulations that set out procedures to use when individuals in
Section 515 housing no longer meet the requirements.  For
example, 7 C.F.R. § 3560.158 provides in pertinent part:

> (a)  General requirements.  Tenants must
> continue to meet the requirements of
> § 3560.152 to remain eligible for occupancy.
>
> (b)  Tenants no longer eligible.  Tenants who
> are no longer eligible for occupancy under
> the housing project's occupancy rules or do
> not meet the criteria set forth in
> § 3560.155(c) and (e) must vacate the
> property within 30 days of being notified by
> the borrower that they are no longer eligible
> for occupancy or at the expiration of their
> lease, whichever is greater, unless the
> conditions specified in paragraph (c) of this
> section exist.
>
> (c)  Temporary continuation of tenancy.  If
> conditions described in § 3560.454(b) or the
> following conditions exist, borrowers may
> permit tenants who are no longer eligible for
> occupancy to continue to reside at the
> housing project with prior approval of the
> Agency.
>
>> (1) The waiting list for the specific
>> rental unit type has no eligible applicants;
>> or
>>
>> (2) The required time period for
>> vacating the rental unit would create a
>> hardship on the tenant household.

7 C.F.R. § 3560.454(b) provides in pertinent part:

> (b)  Occupancy waivers.  If the Agency
> determines that a housing project with high

16 - OPINION AND ORDER

> vacancies could be kept operationally and
> financially viable by allowing the borrower
> to accept as tenants persons with incomes
> above the income eligibility standards
> specified in § 3560.152(a), the Agency, in
> writing, may grant the borrower an occupancy
> waiver to allow such persons as tenants.
> Occupancy waivers will be in effect only
> during the time period specified by the
> Agency when the waiver is granted.  In
> addition, borrowers must rent to all eligible
> applicants on the housing projects waiting
> list prior to accepting persons with incomes
> above the Agency standards as tenants.

Thus, RHS has procedures and guidelines for both removing

ineligible tenants from Section 515 housing and for waiving the

requirements of Section 515 in certain circumstances.

Accordingly, neither option noted by Federal Defendants

is untenable, and the Court concludes this issue does not tip the

equitable balance in favor of Defendants.

**B.   Budgetary Considerations**.

Federal Defendants assert RHS would have "significant

budgetary concerns in order to comply with a Court order

reinstating the [Seacrest Section 515] loan."  Nevertheless,

Federal Defendants concede "there is a mechanism for the [RHS] to

undue [*sic*] the transfer, therefore, . . . the relief is [not]

impossible in theory. . . . [But] it may not be possible in

reality."

To support their assertion, Federal Defendants rely on

the Affidavits of Laurence Anderson, Assistant Deputy

Administrator for Multi-Family Housing for the Housing and

17 - OPINION AND ORDER

Community Facilities Programs of the Rural Development Mission Area in the United States Department of Agriculture (USDA), and Stan Rooney, Multi-Family Housing Loan Specialist for the USDA, Rural Development, Multi-Family Housing Program.

In his Affidavit, Anderson testifies Section 515 loan funds would be required to address the rehabilitation and maintenance needs of Seacrest.  He maintains, however, Section 515 loan funds have limited allocations, and "sufficient funding may not be available to support the project needs and entitlements that participation in the Section 515 program requires."  Anderson further testifies "the President's budget for Fiscal Year 2008 contains no request for Section 515 funding," and, even if some funds are available, "government funding cycles limit the availability of . . . Section 515 . . . funds during certain times in the fiscal year."

In his Affidavit, Rooney testifies the Seacrest loan balance that DBSI paid off in November 2003 was $205,146, which RHS would need to refund to DBSI if the Court rescinded the sale. Rooney testifies he is "not aware . . . whether the funds needed for this payment are currently available."  Before returning Seacrest to Section 515 status, Rooney testifies RHS would need to do a title search, obtain a current appraisal of the property, and reestablish the financial status of the property "consistent with conditions of rents, rental assistance, and subsidy existing

at the time of pay off of the loan." Rooney asserts "[t]his would be an extremely costly and complex accounting process in terms of employee time and required funding."

In their Reply, Plaintiffs contend Federal Defendants' assertion that funds may not be available to support the return of Seacrest to Section 515 housing in light of the fact that the President has not requested any Section 515 funding for fiscal year 2008 is unfounded. According to Plaintiffs, the President did not request any Section 515 funding for the previous three fiscal years, but, nevertheless, Congress appropriated funds for the program in those years. Plaintiffs also assert neither the Affidavit of Anderson nor Rooney provides sufficient factual support for Federal Defendants' contention that RHS would have significant budgetary concerns if the Court rescinds the sale of Seacrest.

The Court finds the Anderson and Rooney Affidavits are vague and only show that it is uncertain whether RHS would have sufficient funding or access to sufficient funding if it had to refund DBSI's prepayment. These Affidavits, therefore, do not establish a sufficient basis to deny the statutory relief Plaintiffs seek. In addition, the Court notes the Ninth Circuit has held the government's economic loss cannot be considered compelling when balancing the equities if the government incurred the loss while knowingly acting in contravention of federal law.

19 - OPINION AND ORDER

*See, e.g., Northern Cheyenne Tribe v. Hodel*, 851 F.2d 1152, 1157
(9th Cir. 1988)(Secretary of Interior not allowed to consider
investments made on the basis of a defective EIS).  Here Federal
Defendants concede they knowingly allowed DBSI to prepay the
Seacrest mortgage in contravention of federal law.  Accordingly,
the Court does not give great weight to the government's concerns
about the economic consequences associated with rescinding the
prepayment of Seacrest's mortgage.  *See Ctr. for Biological
Diversity v. Norton*, 304 F. Supp. 2d 1174, 1179 (D. Ariz.
2003)("Budgetary constraints, far from being exceptional, are an
everyday reality.").

**C.   DBSI and Northwest's Financial Considerations.**

Northwest asserts if the Court rescinds the sale of
Seacrest, Northwest will lose its ability to recoup its start-up
costs of $25,000 and the $35,000 spent to obtain financing to
rehabilitate the Seacrest property.  In addition, Northwest and
DBSI contend they cannot be made whole for their losses with
money damages because real property is unique.

Plaintiffs assert none of these grounds is compelling.
According to Plaintiffs, Northwest's $25,000 in start-up costs
arose from the fact that DBSI sold and transferred Seacrest to
Northwest before DBSI prepaid the RHS loan and before RHS
released Seacrest from the Section 515 program.  Northwest,
therefore, had to subsidize Seacrest residents' rent while the

20 - OPINION AND ORDER

RHS loan was in place and for several months thereafter.  Thus, Plaintiffs argue these costs should not be considered when balancing the equities.  Northwest purchased Seacrest without any assurance that Northwest would be approved as a Section 515 borrower or that the government's rental-assistance subsidies would continue after Seacrest was transferred.  Because Northwest did not have any guarantee that it would recoup the money it used to obtain financing to purchase Seacrest, Plaintiffs contend Northwest acted at its own risk when it spent the money before the RHS lien was released and made other expenditures after December 15, 2003, (the date Plaintiffs notified Northwest of their APA action).

The Court finds Plaintiffs' arguments persuasive.  If the Court rescinds DBSI's prepayment and the sale of the property to Northwest, DBSI and Northwest are not without recourse.  As the Ninth Circuit pointed out when it remanded Plaintiffs' APA claim to this Court,

> if appellants' APA claim proves successful and Seacrest is returned to the Section 515 program, DBSI may still have recourse for RHS's apparent breach of contract.  In *Franconia Associates*, . . . the Supreme Court noted the availability of a damages action under the Tucker Act, 28 U.S.C. § 1491, to compensate owners for contracts breached because of ELIHPA.

*DBSI/TRI IV Ltd. P'ship v. United States*, 465 F.3d 1031, 1041 (9th Cir. 2006)(citing *Franconia Assocs. v. United States*, 536

21 - OPINION AND ORDER

U.S. 129 (2002)).  Northwest, in turn, also may be able to bring
an action against DBSI or to join in an action against the
government.  In any event, neither DBSI nor Northwest is without
a remedy for alleged monetary damages in this matter.  Although
it has been held that real property is unique and, therefore,
damages often are not a sufficient remedy, courts generally have
reached this conclusion in actions brought by individuals who
seek to live on the property rather than in actions brought on
behalf of commercial investors.  *See, e.g., Geneva Ltd. Partners
v. Kemp*, 779 F. Supp. 1237, 1241 (N.D. Cal. 1990)(money damages
were an adequate remedy for partnership that owned and lost
through foreclosure federally subsidized, low-income housing
because it owned the property in a commercial rather than a
residential capacity).  The Court, therefore, concludes the
allegations of potential monetary damage by Northwest and DBSI
are insufficient to tip the balance of equities in Defendants'
favor.

Finally, as noted, the Ninth Circuit and the Supreme
Court have made clear that a court, when balancing the equities,
"must act within the bounds of the statute" and may not refuse to
issue an injunction when it is necessary to preserve precisely
that which the statute seeks to preserve.  *Sierra Pac. Indus.*,
866 F.2d at 1111.  *See also TVA v. Hill*, 437 U.S. 153 (1978).  In
addition, even though courts should exercise their equitable

22 - OPINION AND ORDER

powers to ensure agencies' compliance with the law, courts must not use their equitable powers to excuse or to negate agencies' illegal actions.  *See, e.g., Northwest Env't Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 80-81 (9th Cir. 2007) ("[I]f [the court] conclude[s] . . . [the agency] violated the APA by acting . . . contrary to law, [the court] ha[s] the ability and indeed the juristic duty to remedy [the agency's] violation.").

Federal Defendants concede they acted in violation of the law when they allowed DBSI to prepay the Seacrest mortgage and removed Seacrest from the Section 515 program without following the procedures set forth in ELIHPA.  Congress enacted ELIHPA specifically to prevent such prepayments and transfers of property out of low-income housing programs.  With ELIHPA, Congress was attempting to reverse the nationwide increase in mortgage prepayments of low-income housing units, loss of low-income housing units, and displacement of low-income housing residents that was occurring at that time.  *Corby Homes Ltd. P'ship v. United States*, 38 Fed. Cl. 204, 206 (Fed. Cl. 1997)(describing history and purpose of ELIHPA).  To preserve that which ELIHPA seeks to preserve (*i.e.*, a reduction in Section 515 mortgage repayments, a reduction in the loss of low-income housing units, and a reduction in the displacement of Section 515 residents), the Court concludes, in the exercise of its

23 - OPINION AND ORDER

discretion, that the equities weigh in favor of Plaintiffs.

## CONCLUSION

For these reasons, the Court **GRANTS** Plaintiffs' Motion for Summary Judgment (#118).

IT IS SO ORDERED.

DATED this 14th day of June, 2007.


/s/ Anna J. Brown
_____
ANNA J. BROWN
United States District Judge

24 - OPINION AND ORDER