# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

**SHERRY GOLDAMMER**, et al.,                          Civil No. CV 03-1749-BR

Plaintiffs,

v.                                          **STIPULATED MOTION FOR ORDER**
                                            **APPROVING SETTLEMENT**
**MIKE JOHANNS**, et al.,                    **AGREEMENT**

Defendants.

The parties have entered into a settlement agreement, which settlement agreement is attached hereto as Exhibit A. Pursuant to ¶11 of said agreement, the parties now move this Court to enter an Order approving said agreement, and its entry as an Order of the Court. The parties require such an order to permit the Federal Defendants to fulfill all of its obligations under the settlement agreement.

The parties expect to be able to meet all of the contingencies set forth in the settlement agreement by November 30, 2009. In addition, the Plaintiffs and Federal Defendants have reached a settlement of Plaintiffs' claims for attorneys fees and costs. Therefore the parties expect to be able to move the Court to dismiss the case with prejudice by December 1, 2009

Dated this 24th day of November, 2009.

Respectfully submitted,

/s/ Arthur Schmidt
Arthur Schmidt, OSB 87401
Oregon Law Center
921 SW Washington, #516
Portland, Oregon 97205
Telephone:     503-473-8316
   Of Attorneys for Plaintiffs

Kent S. Robinson
Acting United States Attorney
District of Oregon

/s/ Ronald K. Silver
Ronald K. Silver
Assistant United States Attorney
District of Oregon
1000 SW Third Avenue, # 600
Portland, Oregon 97204
Telephone:     503-727-1044
   Of Attorneys for Federal Defendants

/s/ C. Clayton Gill
C. Clayton Gill
Moffatt Thomas Barrett Rock & Fields
PO Box 829
Boise, Idaho 83701
Telephone:     208-345-2000
   Of Attorneys for DBSI Defendants

/s/ Richard M. Price
Richard M. Price
Nixon Peabody LLP
401 Ninth Street NW, Suite900
Washington, DC 20004
Telephone:     202-585-8716
Of Attorneys for Northwest Defendants

# EXHIBIT A

# SETTLEMENT AGREEMENT

This settlement agreement in *Goldammer v. Johanns*, Civil No. 03-1749-BR (D. Or.), is entered into by and between the United States Department of Agriculture through its agency the Rural Housing Service ("RHS"), DBSI/TRI IV Limited Partnership ("DBSI"), Northwest Real Estate Capital Corporation ("Northwest"), and Sherry Goldammer, Donald Gerhard, Carmen Thomas, Ron Veillon, and Diana Rhodes ("Plaintiffs"), collectively referred to as the "Parties."

1. By this agreement the Parties intend (a) to return Seacrest Apartments ("Seacrest") to the RHS Section 515 program, (b) rehabilitated in accordance with RHS standards, (c) with Northwest, or Seacrest Affordable Housing Preservation, Limited Partnership (hereinafter collectively referred to as "Northwest Seacrest"), as the owner and Section 515 borrower, (d) with Section 521 Rental Assistance subsidies ("RA") available to every qualified household in the development. Initially, Northwest Seacrest will be operated by Seacrest Community Development LLC, its general partner, which in turn will be owned by Northwest.

2. Northwest will use an escrow agent to handle the closing of the RHS loan to Northwest Seacrest and any other related matters set forth in this settlement agreement.

3. Contingent on Northwest Seacrest qualifying as an eligible borrower, RHS and the Plaintiffs accept Northwest Seacrest as the borrower/owner for Seacrest under the Section 515 program and RHS agrees to make a Section 515 loan in the amount of $560,000.00 to Northwest Seacrest, which will be made available to Northwest Seacrest at the loan closing. The loan funds will be used to rehabilitate Seacrest and to pay for RHS-approved costs associated with the rehabilitation.

4. Prior to the closing of the loan, RHS will formally commit and make available to Northwest Seacrest 20 units of RA. The Rental Assistance shall be available to Northwest Seacrest immediately after the closing of the RHS loan. The RA shall be administered by Northwest Seacrest in accordance with RHS regulations.

5. Prior to the closing, Northwest Seacrest must meet all conditions set forth in RHS's letters of condition dated January 9, 2009, which are attached hereto as Exhibits A and B.

6. DBSI's 2003 prepayment will be reversed by RHS depositing $ 205,152.02 into escrow. The deposit of said funds satisfies all RHS obligations to DBSI resulting from the Court's Order of June 14, 2007. DBSI will execute a current standard RHS Promissory Note reflecting the obligation to repay RHS the $205,152.02. DBSI will be released from further obligation on the debt upon assumption of the debt by Northwest Seacrest at closing.

7. At the time of closing, DBSI will be paid a total of $620,152.02 ($205,152.02 +$415,000.) DBSI agrees that all Northwest or Northwest Seacrest obligations owed to it in connection with Northwest's purchase of Seacrest will, at the time of loan closing, have been satisfied or voided.

8. As a requirement of closing with RHS, Northwest will proceed in good faith to obtain sufficient funds to pay the acquisition and rehabilitation expenses identified in the Capital Needs Assessment and/or Scope of Work in excess of the RHS funds committed in this settlement agreement. Such funds may be:
   (a) Through an equity investment by a third party participating in the low-income tax credit program, and supplemented as necessary with T-CAP funds; or
   (b) Through the 1602 exchange funds by which the previously awarded tax credits are exchanged (at up to 85 cents to the dollar); or
   (c) Through other funding arrangements acceptable to RHS that will not negatively affect the financial viability of the project in the short or long term.
Receipt or binding commitment of sufficient funds to pay the acquisition and rehabilitation expenses in excess of the RHS funds committed in this settlement agreement shall be a requirement of closing with RHS.

9. The RHS loan closing and the transfer of Seacrest from Northwest to Northwest Seacrest will take place within 90 days of the signing of the Settlement Agreement, so long as the parties have received approval by the Bankruptcy Court (see ¶ 12 below) and all contingencies set forth in this agreement have been removed. Upon closing, Seacrest will be returned to the Section 515 program. If, within said 90 days, the parties do not receive approval from the Bankruptcy Court, or are unable to remove all contingencies, the parties will notify the Court and seek to resolve any differences consistent with paragraph 17 of the Settlement Agreement.

10. As part of the loan closing, all Parties agree to execute any and all documents necessary to effectuate the transfer of Seacrest to Northwest Seacrest and to do all other things necessary to assist in the reinstatement of Seacrest into the Section 515 program. This includes, but is not limited to, the release of any lis pendens that have been filed against the property as well as any liens filed by DBSI in connection with its prior sale of Seacrest to Northwest.

11. Upon execution of this Settlement Agreement, the Parties will present it to the Court for approval and for its entry as an order.

12. DBSI, Inc., the former managing partner of defendant DBSI/TRI IV Limited Partnership, has filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the District of Delaware, Case No. 08-12687-PJW. Upon execution of this Settlement Agreement, the bankruptcy debtor will seek the Bankruptcy Court's approval of the terms hereof.

13. Upon closing, Northwest Seacrest agrees to operate and maintain Seacrest in the RHS program for the term of the Section 515 loan. Any transfer of the development to another

owner/borrower must be with the approval of RHS and must maintain the development as affordable housing according to the terms of the loans.

14. Seacrest residents who hold HUD Section 8 vouchers on the date of the loan closing will have 90 days from that date to choose whether to retain their Section 8 vouchers or to receive RA. If they choose to relocate they will have an additional 30 days to relocate to other housing. RHS will not terminate any RA assistance to Seacrest before the expiration of this 120 day period and any reasonable period necessary to convert from the Voucher Program to the Rental Assistance Program, provided the total time in which RA is not used does not exceed that allowed by RHS regulations. Unless a Section 8 voucher-holding tenant has affirmatively indicated an intent to relocate, remaining in Seacrest beyond the 90 day period for making a choice whether to remain on the Section 8 Voucher program constitutes an election by a household to receive RA and to surrender its Section 8 voucher to the Coos Curry Housing Authority.

15. The proposed rehabilitation of Seacrest pursuant to ¶ 3 will require the temporary dislocation of the residents. The dislocation will be governed by defendant Northwest's "Seacrest Property Dislocation Plan and Budget," attached hereto as Exhibit C, except that if there are any inconsistencies between the attached Exhibit C and the process or substance required by RHS regulations, the RHS regulations will control.

16. Upon closing, Northwest Seacrest will not renew the lease of any current Seacrest tenant who is ineligible for continued residence under the Section 515 program. For those ineligible tenants whose leases expire within a 60 day window of the signing of the settlement agreement, such leases may be renewed for an additional 30 days to give such tenants adequate time to move. Upon execution of this agreement, Northwest will not admit households ineligible for the Section 515 program.

17. The District Court will retain jurisdiction over *Goldammer v. Johanns,* Civil No. 03-1749-BR, until the Seacrest development is reinstated into the Section 515 program, at which point the action will be dismissed with prejudice. Plaintiff's time to move for attorney fees and costs against federal defendants pursuant to F.R.Civ.P. 54(d)(2) will begin to run upon entry of the judgment of dismissal. Plaintiffs, DBSI and Northwest shall waive any claim for costs and/or attorney fees against each other should this settlement be consummated. Futhermore, all parties, other than Plaintiffs, waive any claim for attorneys fees or costs against the federal defendants, and the federal defendants waive any claim for attorney fees or costs against DBSI and Northwest if the settlement is consummated. In the event that the terms of this agreement are not carried out for any reason, or other disputes arise between the parties prior to the reinstatement of Seacrest development into the Section 515 program, the parties agree to attempt to resolve such issues or disputes among themselves in good faith. If the parties are unsuccessful, the parties agree to seek the assistance of the Court, or Magistrate Judge Coffin to resolve said disputes.

DATED this ___24^th___ day of ~~September~~ November, 2009.

C. Clayton Gill
MOFFATT THOMAS
PO Box 829
Boise, ID 83701
Tel. 208-345-2000

Of Attorneys for DBSI/TRI IV

Arthur Schmidt, OSB 87401
OREGON LAW CENTER
921 SW Washington, #516
Portland, OR 97205
Tel. 503-473-8316

Of Attorneys for Plaintiffs

Ronald K. Silver
Assistant United States Attorney
1000 SW Third Avenue, #600
Portland, OR 97204
Tel. 503-727-1044

Of Attorneys for Federal Defendants

Richard M. Price
NIXON PEABODY LLP
401 Ninth Street NW, Suite 900
Washington, DC 20004
Tel. 202-585-8716

Of Attorneys for Northwest Defendants



**United States Department of Agriculture**
**Rural Development**
Oregon State Office

Date: January 9, 2009

SUBJECT: Loan Approval Conditions for Seacrest Affordable Housing Preservation,
Limited Partnership
Seacrest Apartments
20 Units – Elderly – Currently Receives HUD Section 8
Bandon, Oregon

TO: Raquel Guglielmetti, Vice President of Finance
210 W. Mallard Drive
Boise, Idaho 83706

Dear Raquel:

This letter established conditions under which USDA – Rural Development will approve
financial assistance. The approved financial assistance is as follows:

| | | | |
|---|---|---|---|
| Reinstated RD Loan | $ 205,152.02 | 30 Year Term/42 Year Amortization | 5.375% |
| Non-MPR RD 515 Loan | $ 560,000.00 | 30 Year Term/42Year Amortization | 5.375% |
| 9% Tax Credits | $1,449,852.00 | | |
| Owner Contribution | $ 120,000.00 | | |

Total Sources of RD and Leveraged Funds = $2,335,004.02

20 Units of Rental Assistance to be Transferred or Obligated to the Project

In addition, the approved financial assistance is subject to the following:

The conditions indicated in Part I must be met before the start of construction or closing
of the interim loan, whichever occurs first. The conditions indicated in Part II must be
met as indicated in the condition itself prior to project completion and closing of the
USDA – Rural Development loan. In all cases, "the applicant" means Seacrest
Affordable Housing Preservation, Limited Partnership.

## PART I – APPROVAL

(1) Payments due the seller in the form of any equity must be paid from cash or
third party sources other than the approved Section 515 loan.

1201 NE Lloyd Blvd., Suite 801 - Portland, OR 97232-1274
Phone: (503) 414-3353 · Fax: (503) 414-3393 · TDD: (503) 414-3387 · Web: http://www.rurdev.usda.gov/or

Committed to the future of rural communities.

"USDA is an equal opportunity provider, employer and lender."
To file a complaint of discrimination, write USDA, Director, Office of Civil Rights, 1400 Independence Avenue, SW, Washington, DC 20250-
9410 or call (800) 795-3272 (voice), or (202) 720-6382 (TDD).

(2)     The initial reserve deposit (IDRR) at time of closing has been determined to be $41,661, which must be deposited into the projects replacement reserve account to be used to meet future capital needs of the property. The annual reserve requirement (ADRR) will be $20,000 and will increase annually by a 2.6% inflation rate. The Agency acknowledges this amount in not sufficient to address the 20-year needs of the property, as the reserve account would reflect a negative reserve balance in year three. The applicant therefore, must subsequently request amendments to the loan agreement, which with any luck would decrease the amount of funds to be contributed and held in a reserve account based on an acceptable post rehab capital needs assessment submission. The applicant will also need to apply for and obtain other grant financing including but not limited to assistance through the Multifamily Preservation and Revitalization Program, as deemed necessary, to ensure sufficient cash flow to meet the annual reserve requirement and provide long-term property viability.

(3)     All conditions set forth in the Conditional Acceptance prepared by the Rural Development's National Office.

(4)     A Letter of Intent (LOI) from Wells Fargo, the direct investor, outlining the conditions under which they will purchase the tax credits.

(5)     The applicant is contributing towards the project as initial equity. The amount of this contribution has been determined to be $120,000 and must be in the form of cash and/or land.

Evidence of the above contribution must be provided at or before closing. This amount represents the applicant's initial investment on which an annual return to owner of $11,712 will be allowed. The underwriting template of December 11, 2008 has calculated this figure based on the equity coming into the transaction for payment of hard costs on construction. Please refer to 7 CFR 3560.68 (b) (1).

(6)     This project will be funded utilizing multiple advances for construction/rehabilitation in accordance with 7 CFR 3560.71(c). The applicant will be advised of the procedure and furnished with appropriate forms. No loan funds will be disbursed until the applicant's full required contribution has been expended.

(7)     Organizational documents, including any amendments, must meet USDA – Rural Development requirements and be approved by the Office of General Counsel before the loan is closed. None of the Limited Partnership agreements to date is going to be useful. As it turns out (from the redline) that the June version is no new RD money (or provisions) the Oct version is the RD pays for everything and no tax credits version. Our Office of General Counsel provided a very conditional entity ok – "assuming the "RD provisions" stay in, the terms

2

of the deal get corrected to the financial terms and parties agreed to and all related provisions get re-inserted and/or adjusted appropriately and no terms that negatively affect the financing or RD get added, then this will work as an entity." RD, in turn, will keep in its Letter of Conditions conditional acceptance on a final OGC approval of the "right" terms and corresponding language content by closing.

(8) If the applicant still plans to request a waiver of the competitive bidding for this project, the waiver request must meet RD Instruction 1924-A, § 1924.13 (e) (1) (vii) (A). The initial "Waiver of Competitive Bidding Request" package submitted to this office (dated April 17, 2008) cannot be approved until we have resolved all remaining inconsistencies between the identified needs of the project as evidenced by the applicant's capital needs assessment, the agency's assessment of the property's physical condition, and the work that the applicant states they are willing to perform in the preliminary plans and specifications. Our Construction Analyst enclosed additional clarification in this regard.

(9) Authorization is hereby granted to pay debts for items of expense incurred after the application was filed pursuant to 7 CFR 3560.53.

(10) The applicant must submit items to finish the preliminary Plans and Specifications (reference HB-1-3560 Attachment 3-B):
   - Site survey (present survey is unsigned);
   - Building Plans that clearly indicate the rehab of the designated handicap unit. The items called for in the CNA for this unit such as toilet clear space design solution, interior door hardware, accessible cabinet hardware, relocation of electrical panel, and the kitchen cabinet elevations do not indicate accessible hood/light/fan location nor other electrical mounting heights. The plumbing fixture and appliance schedule for all units do not have the total number of each appliance or fixture that is required. Any demolition that will be required of walls should be noted on the plans.
   - Specifications need to be expanded to include the Standardized Purchasing Guide of NWRECC which reflects the exact products that will be used.
   - The Cost Estimate with sufficient itemization to identify all of the items listed in the CNA.

   All discrepancies between the Plans, Specifications and Cost Estimate must be clearly defined for approval from our State Office Construction Analyst, Claudia Vail-Goss.

(11) The applicant's **final** plans and specification must be review by the State Construction Analyst before final acceptance is made by the State Office. Items needed for final Plans and Specifications (reference HB-1-3560 Attachment 3-B):
   - Site survey (final);

3

- Site Plans detailed for accessibility, signage, drainage, details of all site amenities such as mailboxes, trash enclosure, fencing, laundry, community room, and the office;
- Building Plans detailed for electrical, mechanical, and plumbing;
- Building wall section showing existing conditions and application of new materials such as siding, windows, stairs, decks, handrails, etc.;
- Exterior elevations showing all new material such as siding, windows, roofing, stairs, decks, and handrails;
- Interior elevations of kitchen and baths for units and community room/laundry/restroom showing cabinetry and accessibility;
- Construction details and schedules for doors, windows, finish appliances, plumbing, equipment, that all correspond with the Standard Purchasing Guide for NWRECC;
- Full CSI specifications;
- Final cost estimate with itemization;
- Completed Contract Documents, Waiver of Competitive Bidding, Owner-Architect Agreement.

**No work shall be authorized before final acceptance is made.**

(12) The State Office will arrange a pre-construction conference before <u>any</u> work starts on the project.

(13) A 100 percent Performance Bond and 100 percent Payment Bond is required for this project, unless waived in writing by the interim lender. The applicant will submit either a copy of the bond or the waiver by the interim lender with each copy of the Construction Contract submitted for approval.

(14) Prior to the start of construction, the applicant, contractor and any subcontractor, material supplier or equipment lessor sharing an identity of interest must submit the accounting system that the applicant, contractor, subcontractor, material supplier or equipment lessor and/or the CPA or LPA proposes to set up and use in maintaining a running record of the actual cost. In order to be acceptable, it must allow for a trade-item basis comparison of the actual cost as compared to the estimated cost submitted in accordance with § 1924.13 (e) (1) (iv) of RD Instruction 1924-A, i.e., the accounting system trade-item basis must be consistent with *Form RD 1924-13, Estimate and Certificate of Actual Costs.*

(15) The Construction Contract with appropriate attachments (including the bonds or waiver) between the borrower and the contractor for development of a Rural Rental Housing project must be approved by USDA – Rural Development before the start of construction. Four copies with original signatures must be submitted to the State Office for review.

4

(16) Construction Contracts of more than $10,000 will be subject to the provisions of RD Instruction 1901-E, § 1901.205, Nondiscrimination in Construction Financed with RD loan. This will be discussed at the pre-construction conference. Contractors with 100 or more employee's, and those with 50 or more employees should complete *Forms SF-100, Equal Employment Opportunity Employer Information Report EEO-1 or AD-425, Contractor's Affirmative Action Plan for Equal Employment Opportunity,* respectively, and attach same to the Construction Contract.

(17) A USDA – Rural Development official will sign *Form RD 400-3, Notice to Contractors and Applicants,* and provide copies at the pre-construction conference. USDA – Rural Development Officials will also make sure that the "Equal Employment Opportunity is the Law" sign is posted at the project site.

(18) The applicant's architect must mail a copy of the project inspection report to the USDA – Rural Development Medford Office, Attention: Jay Delapp, Area Specialist, and to the State Office, Attention: Claudia Vail-Goss, State Office Construction Analyst, <u>immediately</u> after each inspection.

(19) All construction and rehabilitation will be completed in accordance with the conditions set forth in RD Instruction 1924-A. In addition, **construction will start no later then 180 days after loan closing.**

(20) *Form RD 3560-34, Loan Agreement,* will be executed by the applicant. Three copies are enclosed with this memorandum. All three copies are to be dated and signed by the applicant as soon as possible. The original and one copy are to be returned to the USDA – Rural Development State Office after signing. These must be returned prior to the start of construction. **This loan is subject to a new 30 year restrictive-use provisions (RUP) for the life of the loan. The restrictive-use provisions and prepayment restriction will be included in the Loan Agreement, Promissory Note and/or Deed of Trust at the time of the USDA – Rural Development loan closing.**

(21) *Form SF 424.2, Application for Federal Assistance,* must be revised and initialed by the applicant to reflect the updated funding and development cost for the project.

(22) *Form RD 1924-13, Estimate and Certificate of Actual Cost,* must be revised to reflect the updated development cost for the project with the following corrections:
  - General requirements cannot be more than 6% of total hard costs, overhead cannot be more than 2%, and builder's profit cannot be more than 6% as required by the Memorandum of Understanding between RD and OHCS. Line #39, 40 and 41 will need to be adjusted accordingly. Please refer to Forms Manual Insert for Form RD 1924-13.

5

- Since U.S. Bank is no longer providing any of the financing, the 3 months debt service reserve needs to be removed from the estimate as a cost.
- Please provide documentation for the tax credit certification cost and legal/advisor fee as soon as it becomes available.
- Contingency fees need to be listed on line #37.
- Applicant to provide evidence of actual interest during acquisition and lease up periods as soon as this documentation becomes available to compare to estimated costs provided at this time.
- Since NWRECC is receiving a non-profit loan packaging fee of $2,000, Rural Development will need a copy of the agreement between the applicant and NWRECC advising of such agreement.
- The new 1924-13 form submitted on December 8, 2008 reflects line item #38, Total Hard Costs, as $751,689. However, the CNA reflects health & safety items to be $26,381 and first year needs of $581,027. Your letter of 9-4-08 states that you are currently completing all of the health and safety needs and that they will all be completed by the end of October. Our Area Office will need to inspect and provide this office with evidence and approval of these completed items. Please contact Jay Delapp at (541) 776-4270 ext. 113 to schedule an inspection.
- The Project Risk Insurance and Surety Bond costs need to be moved to line #39 per the FMI for Form RD 1924-13. Keep in mind that this line cannot be more than 6% of line #38.
- Line #40 has a miscellaneous cost for $1,234.33. Please provide a breakdown/explanation of this cost.
- Please provide documentation of how the Resident Dislocation on line #41 differs from the Tenant Relocation cost on line #56. If they are different, please move Resident Dislocation from line #41 to line #56.
- The Contingency cost needs to be moved from line #41 to line #37.
- While the 1924-13 appears to reflect the total construction costs of the Health and Safety and Year 1 needs identified in the CNA, the individual line items seem to reflect the reduced scope of work proposed in the plans and specifications, such as vinyl siding, reduced painting, no metal deck pan replacement, as well as other items. RD will require an itemized breakdown of the individual line items on the 1924-13 in order to identify items listed on the CNA.

(23) *Form RD 3560-7, Multiple Family Housing Project Budget/Utility Allowance,* must be revised to reflect the correct debt repayment, interest rate, reserve requirement, and return to owner, as referenced in the December 11, 2008 underwriting template. The applicant will provide USDA – Rural Development with an initial operating budget on *Form RD 3560-7, Multiple Family Housing Project Budget/Utility Allowance* executed in duplicate by the applicant, or agent, and submitted to USDA – Rural Development for approval at least 14 days prior to closing. The budget must show enough income to pay all expenses and the required reserve deposit, and must be approved by the State Office. The initial rents cannot exceed those shown on the latest transfer

underwriting template (i.e. $550 for one bedrooms and $650 for two bedrooms per 12/11/08 template.)

(24) Applicant to provide USDA – Rural Development with a current financial statement, including a separate statement for any general partner and certificate of appropriate net worth for limited partners in accordance with 7 CFR 3560.55 and Chapter 4 of the Loan Origination Handbook. The existing one is or will be over 6 months of age at time of loan approval.

(25) Applicant must submit a revised *Form HUD 935.2, Affirmative Fair Housing Marketing Plan.* The rental range in Box 1e should reflect $0 to $715. Box 1b should include "Apartments" after Seacrest. Box 1g should reflect "2008". Box 2a needs reason for update. Box 2b needs to reflect 7.5% minority residents (per census pulled by RD Loan Specialist for the City of Bandon.) Box 4b (2) does not indicate whether it is in inches or feet and there is no photograph of the sign attached. Box 4c "Approximate Date" should reflect "2008". Applicant to provide RD with tear sheet as soon as it becomes available. The letter to Oregon Coast Community Action Agency dated 7-30-08 does not provide the Rural Development definition of elderly and disabled so must be revised. The letter to VFW Post 3440 dated 6-1-08 reflects a different building number then the information on the AFHMP, does not include RD's definition of elderly and disabled, and the statement regarding HUD at the end of the letter is confusing. It appears to say that NWRECC does not discriminate against the protected classes except where HUD regulations apply. This needs to be reworded. The letter to the Senior Center of Bandon needs to define elderly and disabled in accordance with RD regulations as well as reword the last sentence where it discusses that where HUD regulations apply NWRECC discriminates. The flyer/pamphlet from NWRECC provides a number to call for application but the dates disagree with the three letters recently sent out to the community. The flyer for Seacrest Apartments with the numbers located on the bottom that can be torn off the sheet reflects incorrect rent amounts. Please make corrections as indicated. When approved, the "Plan" must be posted in any and all rental offices serving the project. The participant must maintain records reflecting their efforts in fulfilling the requirements and objectives of the "Plan" and such records will be made available to USDA – Rural Development for review.

(26) Both the applicant and the general contractor must execute a "Certification for Contract, Grant and Loans" (separate certificates) per RD Instruction 1940-Q.

(27) Applicant must submit a revised Management Plan and Management Agreement. The following is a list of concerns regarding these documents in the order of the checklist:
- 1d) & e)—page 20 discusses resident services and not key contact for the management agent and what type of decisions they are allowed to make.

- 1f)—page 1, 2 & 3 are not clear on whether there is an overlap of duties and, if so, how will they be handled.
- 1g)—page 4 & 5 are not clear as to whether or not there are any pro rata divisions of singularly incurred operating expenses.
- 3b)—did not locate on either page 8 or 9.
- 3c)—did not locate on either page 8 or 9.
- 3e)—doorknobs are not included on page 9 of reasonable accommodations.
- 3i)—page 11 does not indicate whether this information is given verbally or written.
- 3j)—did not locate how the person responsible for determining tenants eligibility and their location on the waiting list on page 9.
- 3k)—did not locate this requirement on page 10.
- 4a)—page 9 and 10 do not advise on whether or not there are application fees.
- 4b)—page 7 and 8 do not describe knowledge or abilities needed BEFORE assuming rental related duties or how "testing" will be accomplished.
- 6a)—page 12 does not describe which staff position handles collections or the provisions for collection after hours.
- 6b)—page 12 does not describe on how interest will be earned on deposits.
- 8c)(2)—page 15 and 16 does not include scheduling of ice removal.
- 8c)(3)—page 16 does not include maintenance or redecoration incidents and how they will be scheduled.
- 8c)(7)—page 14 and 15 does not include parking lot or entryways in the scheduling.
- 8e)—did not locate on page 17.
- 8f)—did not locate on page 13.
- 9b)—page 20 did not describe if equipment was owned and operated by the owner or a vendor (was not clear).
- 10b)—is accounted "separately" the same as "corresponding account"?
- 10c)—did not locate on page 16 or 17.
- 10e)—did not locate on page 20.
- 10f)—page 17 did not describe which person handles maintaining and retention of the tenant's record.
- 10g)—did not locate on page 6.
- 12b)—page 19 describes that the grievance and appeals procedure will be on site—needs to include exactly where they will be on site.
- 14a)—did not locate on page 7 or 8.
- 20d)—did not locate on page 5 or 6.
- 21)—page 21 does have a space for signatures, dates and titles—however not completed since document is currently a draft. This office will need signatures, dates and titles prior to closing.
- Attachment of "Open work orders for May thru July of 2008" reflects Viking Village as having "67" open work orders. Please provide this office with explanation of why.

- Please provide example of "Authorization Form" from when a third party requests information from a tenant file.
- Please make all of the above corrections and provide a revised plan.

Also need to determine if specific operating and maintenance items listed on the budget are duplicates and/or should be paid from the management fee. In addition, Management Plan must include a system for routine, responsive, and preventative maintenance to achieve the standards listed in 7 CFR 3560.103. Please see 7 CFR 3560.103 (a) and (b). The plan must also indicate that capital budgeting and planning will be completed in accordance with the approved capital needs assessment dated June 14, 2008. However, this required maintenance schedule is subject to change when a new post rehab capital needs assessment is received and accepted by the Agency.

(28) This approval is conditioned on the applicant providing an as-is conventional or unrestricted value and an as-improved appraisal with subsidy evidencing the Agency is adequately secured with the additional debt. The conventional value appraisal was requested back in October. The as-improved appraisal can be ordered just as soon as the issues regarding the scope of work and preliminary plans are resolved and the applicant has presented a budget that follows along with the underwriting template(s).

(29) Approval of the USDA – Rural Development proposed financing offered in the transfer underwriting template is subject to availability of federal funding for the 2009 fiscal year.

# PART II – MITIGATION MEASURES

(1) Seacrest Affordable Housing Preservation, Limited Partnership shall comply with all applicable county, state, and federal regulations. Seacrest Affordable Housing Preservation, Limited Partnership, shall obtain and comply with all required county, state, and federal permits, and shall submit their design plans for review, including mitigation measures.

(2) Installed equipment must meet current State of Oregon regulations for noise.

(3) Construction activities shall be restricted to 8:00 am to 5:00 pm, Monday through Saturday, unless alternative hours are approved by the City of Bandon. Noise abatement technology, such as mufflers, shall be properly maintained on construction vehicles and machinery to minimize the potential for disturbance of wildlife and nearly residents.

(4) Construction equipment shall be equipped with hazardous materials spill recovery kits and construction crews shall be trained in their use.

9

(5) An Unanticipated Discovery Plan (UDP) must be "in place" before Notice to Proceed is issued. If earth disturbing activities during project construction uncover cultural materials (i.e. structural remains, historic artifacts, or prehistoric artifacts), the area around the discovery shall be secured, all work shall cease and the appropriate authorities shall be contacted to discuss appropriate protocol for removal, inventory, and proper preservation of the resource(s). These authorities are: 1) RD State Environmental Coordinator (SEC) Charlotte Rollier, at (503) 414-3356; 2) the Oregon State Historic Preservation Office Archaeologist, Dennis Griffin, at (503) 986-0674. The RD SEC will notify any applicant tribal contacts.

(6) If earth disturbing activities during any area of the project uncover human remains, all work shall cease immediately in accordance with the Native American Graves Protection and Repatriation Act of 1990 (NAGPRA). The area around the discovery shall be secured and the Coos County Coroner and RD SEC shall be notified immediately. The RD SEC shall notify the State Archeologist at SHPO and the appropriate tribes without delay.

(7) The applicant will use BMP to control dust, temporary erosion and sedimentation during construction of the project.

(8) Disturbance of existing vegetation shall be kept to a minimum. Upon completion of the project, all disturbed ground shall be revegetated or resurfaced.

(9) Prior to commencing construction, an asbestos management plan must be developed to comply with all state and federal regulations for notification, sampling, and construction activities. In the event of renovation or demolition of any structures on the subject property, which would disturb any materials suspect of containing asbestos, a certified asbestos building inspector/contractor must perform as asbestos survey prior to beginning construction activities. Any recommendations resulting from the survey must be implemented and re-inspected for compliance after construction is completed.

(10) The construction contractor will be required to submit a traffic control plan that must be approved by the county and/or ODOT, which will be strictly enforced.

(11) When disposing of excess, spoil, or other construction materials on public or private property, the ultimate recipient shall not fill in or otherwise convert wetlands or 100-year floodplain areas delineated on the latest Federal Emergency Management Agency (FEMA) floodplain maps.

10

# PART III – CLOSING CONDITIONS

(1) The applicant must provide an updated American Land Title Association (ALTA) Preliminary Title Report to the USDA – Rural Development State Office, prior to submission to OGC for closing instructions. Minimum coverage to be $766,968 ($206,968 for the RD loan being re-instated and $560,000 for the new RD 515 loan).

(2) Public liability and property damage insurance in a minimum amount recommended, in writing, by the applicant's attorney must be approved by the USDA – Rural Development State Office, at least 14 days prior to loan closing, and letter and evidence of coverage must be provided. Coverage must insure all common areas, commercial space, and public ways in the security premises. Coverage must also cover applicant's exposure to certain risk such as errors and omissions, environmental damages, or protection against discrimination claims. The applicant's limit of liability per occurrence for personal injury, bodily injury, or property damage under the terms of coverage must be at least $1 million with a deductible not to exceed $5,000 per occurrence.

(3) Worker's Compensation: The applicant will be required to carry workers compensation insurance for all its employees in accordance with the applicable state laws of Oregon.

(4) Fidelity Coverage: Any personnel entrusted with the receipt, custody, and disbursement of any project monies, securities, or property will be covered. The types of coverage policy and minimum amount of coverage will be in accordance with 7 CFR 3560.62(d) and 7 CFR 3560.105. Fidelity coverage must be obtained before any interim financing funds or loan funds are made available. As evidenced in the December 11, 2008 underwriting template, the fidelity exposure index is proposed to be $41,000 for a necessary coverage of $13,000. Deductible to be no greater then $1,000. This required coverage amount is subject to change if this office were to receive most recent "actual budget" that reflects actual balances of cash subsidy, security deposits with interest, cash carry-over, CD's, and tax and insurance escrows.

(5) Fire insurance, including extended coverage, on buildings included as security for the loan will be required in an amount not less than the "Total Estimated Reproduction Cost New of Improvements" as reflected on the most recent appraisal of June 2003. According to this June 2003 appraisal, this amount would be $530,358 with a deductible no greater than $2,652. However, this required coverage is subject to change when a new appraisal is ordered. Evidence of the first year paid premium must be provided to USDA – Rural Development at least 14 days prior to closing. The standard mortgage clause adopted by the Agency *Form RD-426-2, Property Insurance Mortgage Clause (Without Contribution)* must be attached to or printed in the insurance policy.

11

(6) The loan is to be closed in accordance with RD Instruction 1927-B and supplemental instructions issued by the Regional Attorney. An ALTA Loan Policy of Title Insurance will be required.

(7) A Real Estate Deed of Trust will be taken on the security property. Exceptions to the Preliminary Title Report will be handled in accordance with RD Instruction 1927-B.

(8) A Financing Statement and Security Agreement will also be taken as security for the loan in accordance with 7 CFR 3560.61. OGC will provide necessary forms and instructions as part of their issuance of loan closing instructions.

(9) When it has been determined that loan closing conditions can be met, the following actions will be taken:

   a) The State Office will prepare loan closing instructions and documents for this loan prior to submission to OGC for closing instructions.
   b) The State Office will proceed to order a loan check so that it is available when the loan is ready for closing.
   c) For multiple advances, at time of substantial completion, USDA – Rural Development will be provided with *Form RD 1924-9, Certificate of Contractor's Release,* and *Form 1924-10, Release by Claimants,* executed by all persons who furnished materials or labor in connection with the contract. If such statements cannot be obtained, the loan may be closed in accordance with § 1924.6 (a) (12) (vi) (C) of RD Instruction 1924-A.

(10) The USDA – Rural Development State Office will schedule a conference with the applicant to discuss advertisement of available units, affirmative marketing practices, management and tenancy documents and requirements after loan approval and prior to loan closing. The steps necessary to close the USDA – Rural Development loan (pre-closing conference) are discussed at the time of the conference.

(11) The following materials will be given to and discussed with the borrower and management agent at the conference:

   a) Asset Management Handbook.
   b) Booklets entitled, *Audit Program* and *Audit Program Addendum No. 1.*
   c) *Forms and FMI's: 3560-7, 3560-10, 3560-29, 3560-8.*
   d) Fair Housing and "....and Justice for All" Posters.

(12) The applicant will provide a mid-year *Form RD 3560-7, Multiple Family Housing Projects Budget/Utility Allowance* completed and executed in duplicate by the applicant, or agent, and submitted to USDA – Rural Development for approval no later than 10 days after substantial completion of all rehabilitation. A mid-year budget will also need to be submitted along with

12

the post rehab capital needs assessment and request for change in the amount of annual deposit to reserve and loan agreement documentation. The budget must show enough income to pay all expenses and the required reserve deposit, and must be approved by the State Office. It must reflect the correct debt payment, interest rate, reserve requirement, return to owner, and include the required backup data.

(13) The applicant's tenant lease, application for admission, management agreement, and statement of policy regarding occupancy and tenant selection must be acceptable to USDA – Rural Development at least 14 days prior to closing. The Management Plan is required prior to the start of construction or loan closing, whichever first occurs. Please refer to USDA – Rural Development's letter dated October 17, 2008. Written approval by the USDA – Rural Development Servicing Official is required.

(14) When the project is nearing completion, the applicant will provide the Area and State Offices with *Form RD 1924-13, Estimate and Certificate of Actual Costs* of this major rehab, prepared by a Licensed Public Accountant or a Certified Public Accountant. Forms and instructions may be obtained at http://www.rurdev.usda.gov.

(15) The applicant's architect shall certify that the contractor has completed the work in accordance with USDA – Rural Development approved plans, specifications, and special or general conditions. This certification shall be issued at time of final inspection. Please refer to USDA – Rural Development's letter dated October 17, 2008.

(16) The *Form RD 1924-19, Builder's Warranty,* must be executed by the contractor and owner at time of final inspection.

(17) *Form RD 3560-9, Interest Credit and Rental Assistance Agreement,* will be prepared and executed at loan closing. Interest Credit Plan II will be used for this project.

(18) *Form RD 3560-27, Rental Assistance Agreement,* must be completed, dated, and executed in triplicate as the same time as *Form RD 3560-9.*

(19) It is recommended that an acceptable certification program duly certify the site manager. A copy of the site manager's certificate may be provided for inclusion in the USDA – Rural Development servicing file.

(20) Evidence of Affirmative Fair Housing Marketing activity must be provided to and found acceptable by the MFH Loan Specialist after loan approval but at least 14 days prior to loan closing.

(21) A satisfactory laundry lease, if applicable, is to be provided to the State Office at least 14 days prior to loan closing.

(22) Applicant must certify as to the availability or non-availability of other government assistance at least 14 days prior to loan closing. If other government assistance becomes available prior to loan closing, the loan amount will be decreased.

(23) At loan closing, the USDA – Rural Development State Office will send the final terms of funding to the state housing finance agency or other tax credit allocating agency, and request a copy of *Form(s) IRS 8609, Low-Income Housing Credit Allocation Certification.*

(24) Prior to closing, each loan approval and closing condition will be initialed and dated upon completion. Under no circumstances will USDA – Rural Development close this loan if any approval or closing condition is not fully satisfied or you have not received a written waiver of that requirement from the State Office. Immediately after closing, we will conduct a post-closing review to verify that the loan has been properly closed in accordance with the escrow instructions given the title company. This includes the proper completion, recordation and disbursement of forms.

(25) The necessary closing documents will be determined by our Office of General Counsel.

Please review the conditions of this letter carefully. If it is your intent to meet these conditions, please date, sign, and return the enclosed *Form RD 1942-46, Letters of Intent to Meet Conditions.* In addition, please initial and return the changes made to the *Form RD 3560-20, MFH Transfer and Assumption Review and Recommendation* to Sherryl Gleason, MFH Loan Specialist, at USDA –Rural Development, 1201 NE Lloyd Blvd., Suite #801, Portland, Oregon, 97232-1274.

If you have any questions, please feel free to contact Sherryl Gleason directly at (503) 414-3352.

Sincerely,

RODNEY L. HANSEN
Housing Programs Director

14

Attachments: *Form RD 1942-43, Letter of Intent to Meet Conditions*
*Form RD 426-2, Property Insurance Mortgage Clause*
*Form RD 3560-20, MFH Transfer & Assumption Review &*
*Recommendation*
*Form RD 3560-34, Loan Agreement*

cc:    State Office MFH Loan Specialist, Area Director, Area Specialist

Loan Closing Certification

Date Closed:_____

Fidelity National Title Company
Report No. 24-99725
Supplemental No. 1

_____
Signature of MFH Specialist

15



**United States Department of Agriculture**
**Rural Development**

Ms. Raquel Guglielmetti
Vice President of Finance
Seacrest Affordable Housing Preservation, LP
210 West Mallard Drive
Boise, Idaho 83706

JAN 0 9 2009

Dear Ms. Guglielmetti:

Rural Development received a revised proposal from Seacrest Affordable Housing
Preservation Limited Partnership for the purchase of Seacrest Apartments located in Bandon,
Oregon. Rural Development reviewed and has conditionally accepted the proposal subject to
certain conditions being met. Those conditions include:

1. An appraisal completed to Rural Development standards being reviewed and accepted
   by Rural Development that supports the proposed equity payment of $415,000 as well
   as the total debt against the security property. In addition, the sellers will receive a
   check for $206,968 which is the amount they submitted to pay their Rural
   Development loan off.

2. The Rural Development Section 515 loan in the amount of $560,000 is subject to the
   availability of funds from the fiscal year 2009 allocation. The business terms of this
   Section 515 loan are:

   (a) A 30 year term, 42 year amortization
   (b) The loan will be approved at the note rate of interest in effect at the time of
       approval. If the interest rate changes between approval and closing, the loan
       may be closed at the lowest rate in effect at either approval or closing.
   (c) An Interest Credit and Rental Assistance Agreement will be signed at closing
       reducing the effective interest to one percent.
   (d) Rural Development will provide 20 units of Rental Assistance to this property.
   (e) A new 30 year Restrictive Use Provision must be signed at closing.

3. At closing, the applicant must deposit $41,661 into the project's replacement reserve
   account to be used to meet future capital needs of the property. The annual deposit to
   the reserve account is set at $20,000 and will increase annually by 2.6 percent,
   (inflation).

4. All conditions set forth in the Letter of Conditions prepared by the Rural Development
   Oregon State Office must be complied with prior to closing.

5. Evidence of the owner's entity contribution of $120,000 is available at closing.

1400 Independence Ave. S.W. · Washington DC 20250-0700
Web http://www.rurdev.usda.gov
Committed to the future of rural communities.

USDA is an equal opportunity provider, employer and lender.
To file a complaint of discrimination, write USDA, Director, Office of Civil Rights,
1400 Independence Avenue, S.W., Washington, DC 20250-9410 or call (800) 795-3272 (Voice) or (202) 720-6382 (TDD).

6. The applicants annual Return on Investment (ROI) is set at $11,712. This ROI is based on the equity being brought into the transaction and used for payment of hard costs of construction.
7. A Letter of Intent from Wells Fargo, the direct investor, outlining the conditions under which they will purchase the tax credits.
8. The approved basic rents for this property are set at $550 for the one bedrooms and $650 for the two bedrooms. These rents were determined to be the Conventional Rents for Comparable Units in the market area.

If you have any questions regarding this letter, please contact either Sherryl Gleason of the Rural Development Oregon State Office, (503) 414-3352 or Sherry Engel of the Rural Development Wisconsin State Office, (715) 345-7677.

Sincerely,

Russell T Davis

RUSSELL T. DAVIS
Administrator
Rural Housing Service

# Exhibit C

## Seacrest Property
## Dislocation Plan and Budget

This document serves as a supplement to the Northwest Temporary Dislocation Policies and Procedures Manual for the Seacrest Apartments, located in Bandon, Oregon. These policies apply to residents determined to be eligible under the USDA-RD Section 521 Program for Rental Assistance. If the resident does not qualify to reside in the complex, they may be eligible for relocation assistance under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, as amended (URA), regulations 49 CFR part 24. Northwest Real Estate Capital Corp. (Northwest) will strive to lessen the inconvenience of any resident's dislocation as much as is reasonably possible. Our Northwest Dislocation Staff will coordinate the process and serve as liaisons with CSDI Construction, Inc. (CSDI), our general contractor.

### Process of Rehab

Northwest and CSDI plan to conduct a "rolling" rehabilitation at the Seacrest Apartments. This process involves rehabilitation of multiple apartments (usually four at a time), moving to the next apartment as each one is completed. The dislocation of our residents will be temporary as the rehabilitation of their apartments are completed. ALL residents qualified under the RD Sec 515 Program are to be temporarily dislocated to a hotel as outlined below. Residents will continue to make their rent payments at 30 percent of their AGI, according to the guidelines set forth by the RD Sec 515 Program or the Section 8 Voucher Program (Vouchers). (Eleven families currently hold Vouchers.) Utility expenses incurred by a household at its apartment during its temporary dislocation will be reimbursed to the extent that they exceed that household's normal utility expenses and usage patterns.

CSDI will contract with a professional moving company, required to be bonded and insured, to assist residents as they move in and out of their apartments. Coordinating the movers is essential to ensure rehab continues as planned and to minimize any inconvenience to the residents. Residents will be advised in advance (with multiple notices) of their move schedule. A professional cleaning company is contracted to be sure that residents move into a newly cleaned apartment. CSDI contracts with local subcontractors, which allows them to have workers immediately available for callbacks for any problems that may arise post-rehab. It is imperative that all residents cooperate with these plans. Should any problems arise, the Property Manager should be advised immediately.

### Assistance to Residents

Notices and meetings are held about a month in advance to discuss the rehabilitation process with the residents. The Property Managers meet, individually, with each Head of Household to identify the specific needs of each family in a **Temporary Dislocation Meeting**. A ***Resident Questionnaire*** is completed by each family and reviewed with the Property Manager so Northwest can identify special arrangements necessary so the temporary dislocation may go as smooth as possible.

All residents will be housed in a local hotel with appropriate arrangements made by Northwest. The criteria in selecting a hotel will focus primarily on a location that is decent, safe, and sanitary.

Our search includes hotels located near public transportation, general shopping areas, and affordable restaurants. Additional consideration is given to hotels that provide the best amenities for the resident. This may include complimentary breakfasts, laundry facilities, weekly maid service, cable TV, refrigerators and microwaves, as well as, other amenities the hotel may offer.

Residents will receive a meal allowance in advance at $40 per day, *per person*, according to the area standards set by the *US General Service Administration – Domestic Per Diem Rate*. And to further accommodate each family's unique incidental costs, Northwest will advance $25.00 of the household's Inconvenience Bonus. Although Northwest and the contractor make every effort to remain on schedule, the rehab process is unpredictable. **Residents will be compensated, accordingly, for delays caused by the rehab process.**

Extenuating circumstances may require that a resident be transferred to different apartment under a Reasonable Accommodation Request. If this occurs, Northwest will, also, reimburse the resident for the cost to transfer *existing* utilities and cable, etc. (as outlined in Northwest's Dislocation Unit Transfer Policy) to the new apartment.

Northwest makes arrangements to store all residents' belongings in a locked and secure storage container at the complex. Northwest will arrange with the moving company to provide packing boxes and packing materials for the residents at least 3 weeks prior to their scheduled move. Northwest's Dislocation Staff organizes help to pack and unpack belongings for those residents who need special assistance. This assistance will be discussed with residents at the time of their Temporary Dislocation Meeting. The resident must provide an inventory of stored items valued at $100.00 or more. Northwest strongly recommends that residents take any items of sentimental or significant value with them. The cost for the movers, all packing materials, and storage units are paid by Northwest.

The storage container will use a "lockout system" to be properly secure at all times. No access will be granted except in an emergency, with the only authorized persons allowed to enter the container to be the CSDI Superintendent AND a representative from Northwest AND the Head of Household. All must be present for access to the storage container. The "lockout system" is special inventoried "tag" with a serial number assigned to each resident/container. The container cannot be opened without compromising the tag, which would have to be broken or cut to gain entry. If emergency access is required and the tag is removed, documentation will be required with signatures from all parties to support any activity that has occurred. This provides the best security available for the resident belongings and protects all parties.

## Timeline for Rehabilitation:

A detailed Rehabilitation Timeline (Timeline) is prepared by CSDI and Northwest. CSDI conducts final inspections prior to the bid process to confirm the rehab plans. The detailed Capital Needs Assessment includes a unit-by-unit plan for the extent of rehab required in each apartment. The Timeline determines the *estimated* move schedule for each resident's temporary dislocation. As noted above, four apartments will be under rehab at a time. It is imperative that all parties work together to ensure moves are coordinated in a timely manner. Any delays affect all other residents in the chain of rehab.

Since the rehab for each apartment is unique and the exterior stairs are to be rebuilt, rehab will probably take an average 21 days. After the Temporary Dislocation Meetings are held and CSDI completes the Timeline, each resident will be issued a Resident Assistance Letter (Resident Letter) that has been customized for each household. The Resident Letter details the assistance that will be provided to the family, to include their expected move in/out dates, details for the hotel stay,

their allowances, and the requirements to successfully complete all the Dislocation Process. In order to receive their Inconvenience Bonus, residents must cooperate with property management throughout the rehab process, including the completion of all compliance paperwork.

## Example of Temporary Dislocation Payments:

The following are estimated payments to an average family:

Example: 2 Adults Temporarily Dislocated for 21 Day *

| | |
|---|---|
| Meal Allowance and Incidentals:  $40 per day - per person * | $ 1,680 |
| Inconvenience Bonus – One-time Advance Prior to Dislocation | $ 25 |
| Hotel Costs – Billed directly to Northwest by the Hotel | N/A |
| Transportation to/from Hotel – Estimated (per Household) | $ 20 |
| Bonuses *** (per Household):  $150 Inconvenience / $25 Packing Boxes Return | $ 175 |
| **Estimated Payment to Resident Family:** | **$ 1,900** |

*Northwest reserves the right to divide payment of the allowances into two or more checks – with each payment received in advance of the temporary dislocation period.*

** *Meal Allowances are based on the US GSA - Domestic Per Diem Rates by locality*

*** *Bonuses are paid <u>after</u> all compliance paperwork has been completed and the resident has met all other requirements outlined in the Temporary Dislocation Process.  The timing is at the discretion of Northwest – based upon a schedule for reviewing and processing each resident's file.*